UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CONVERGENT MOBILE, INC.,

        Plaintiff,

        v.

JTH TAX, INC.,

        Defendant.

JTH TAX INC.,

        Counterclaimant,

        v.

CONVERGENT MOBILE, INC.,

        Counter-Defendant.

Case No.  4:19-cv-06484-YGR

RULE 52 ORDER AFTER TRIAL ON THE MERITS

This case arises out of an alleged contractual breach eighteen (18) months into a three-year commercial agreement.  Resolution of the case centered on the allegation of defendant and counterclaimant customer JTH Tax Inc. dba Liberty Tax Service ("JTH") that plaintiff and counter-defendant developer Convergent Mobile, Inc. ("Convergent") failed to perform material aspects of a Master License Agreement ("the MLA") and did not timely cure.  Additional issues included whether JTH provided proper notice of the breach and which party, if either, properly terminated the MLA.  Convergent seeks payment of the balance due under the three-year MLA and attorneys' fees.  JTH countersued for damages based on pre- and post-termination breaches of contract, including for Convergent's alleged failure to return JTH's customer content in a timely manner.

Over the course of a four-day bench trial, the Court heard testimony from seven witnesses and admitted twenty-nine exhibits.  For the reasons set forth herein, the Court concludes: JTH

breached the MLA and the implied covenant of good faith and fair dealing contained therein. Payment is owed to Convergent thereunder in the amount of $601,200 plus prejudgment interest and costs.  The Court's findings of fact and conclusions of law follow.

I.   **STIPULATIONS OF FACT**

Prior to trial, the parties stipulated to the following facts (Dkt. No. 99):

JTH and Convergent entered into an MLA effective December 1, 2017.  The 2017 MLA was a result of a long period of negotiations that had begun in or about February or March 2017. Per the MLA, Convergent agreed to provide services to JTH in connection with Convergent's web-based and mobile communications platform.

Section 8(a) and Annex A, Section IV(A) of the MLA provides the term of the agreement namely, (i) three years for product services called "LBL Pro," "US411," and "OPS411," and (ii) one year for OnTyme unless either are terminated earlier pursuant to the terms of the MLA. Notwithstanding the foregoing, in the event that the parties negotiated and formalized a written agreement to continue provision of the OnTyme service, the integrations completed by Convergent in year one of this MLA were to remain functional during potential future years of service.

The MLA further provided:  First, over the three-year term of the agreement, Convergent was required to provide the "LBL Pro", "US411", and "OPS411" services in exchange for which JTH agreed to pay a monthly fee for those services of $125,400.00.  Second, the MLA also contemplated the additional "OnTyme" service.  The parties agreed that the "OnTyme" function would be provided to JTH at no cost in the first year.  After the first year, per Section V(D) of the MLA, "if the parties chose to continue this service," then for years 2 and 3 of the MLA, "OnTyme's" cost would be "negotiated and formalized in a written document signed by both parties."  Third, Section 1(c) contemplated further development work that CMI might perform for JTH. All such custom development work required the parties to enter into separate "Statements of Work Agreements" ("SOWs") which had to be in writing and executed by both parties. Section 1(c) also noted that any such SOWs into which they entered in the future would include a rate of $125.00 per hour.  Development work was not guaranteed under the MLA.

Section 8(c) of the MLA provides the parties with the grounds for termination of the agreement. Relevant to this action, Section 8(c) provides for termination "(ii) by either party upon thirty (30) days prior written notice in the event of a material breach of the Agreement by the other party, where the other party has failed to cure such breach within thirty (30) days of such notice."

Here, on May 1, 2018, Steve Peters, Vice President of Technology for JTH, sent an email to Convergent's CEO Mickey Breen and other Convergent agents informing Convergent that JTH did not wish to move forward on the OnTyme scheduling application.  The parties never entered into a formal written agreement regarding the OnTyme function.  In the same email, Mr. Peters listed a number of issues JTH had noticed regarding Convergent's performance of its contractual obligations and asked Mr. Breen to investigate and remedy these performance issues identified in the email.

Thirty days later, on May 31, 2018, Convergent's COO Krishna Pillai emailed Mr. Peters and went through each of the issues raised by JTH on May 1, 2018, assuring him that all the issues were resolved.

Section 7(a) states:

> (a) Fees. Customer shall pay to Convergent Mobile the applicable fees specified in Annex A (each, a "Fee"). Each month in advance, Convergent Mobile shall deliver to Customer an invoice setting forth the Platform Services to be rendered to, and the Fees payable by Customer, together with any applicable Taxes (as defined in Section 7(b)). Customer shall pay in U.S. Dollars by check, ACH payment system or wire transfer to Convergent Mobile all applicable Fees and Taxes within thirty (30) days of the date of such invoice.

On or about June 1, 2019, Convergent sent JTH invoice #903 for payment of $125,400.00 for the services Convergent would provide for June 2019. JTH never paid the June 1, 2019 invoice. In a letter dated June 19, 2019, JTH's counsel, William Harvey, notified Mr. Breen, that Convergent had failed to deliver on a number of contractual obligations under the MLA, that such failures to deliver constituted material breaches of the MLA, and that JTH intended to terminate the MLA for cause under Section 8(c) of the MLA.  In a letter dated June 25, 2019, Stephen Peary, counsel for Convergent, informed Mr. Harvey, that with respect to the issues raised in June 19, 2019 letter, Convergent had either already performed, would perform in the time periods outlined

1   in the MLA, or that such issues were not actually required under the MLA.

2   On or about July 1, 2019, Convergent sent JTH invoice #904 for payment of $125,400.00

3   for the services Convergent would provide for July 2019.  JTH never paid the July 1, 2019

4   invoice. On July 10, 2019, Mr. Breen sent JTH a letter demanding payment for a past-due amount

5   of $125,400 pursuant to the June 1, 2019 invoice.

6   On or about August 1, 2019, Convergent sent JTH invoice #905 for payment of

7   $125,400.00 for the services Convergent would provide for August 2019.  JTH never paid the

8   August 1, 2019 invoice.  On August 19, 2019, counsel for Convergent sent JTH's counsel a letter

9   noting that JTH had still failed to pay its past-due amounts in violation of Section 7 of the MLA,

10   and that unless JTH paid all such amounts, Convergent would cease providing any and all services

11   under the MLA on August 21, 2019.  Convergent stopped providing JTH with any further services

12   under the MLA on or by September 1, 2019.

13   Relevant here, the MLA provided for the effect of terminations. Sections 8(d)[1] and 8(e)

14   state:

> (d) Effect of Termination - Customer.
> Immediately upon termination or expiration of this Agreement, Customer shall pay all Fees owing as of the date of termination, and cease all use of, and shall not access or use the System. At Convergent Mobile's written request, Customer will promptly return or destroy all documents and all other materials provided by Convergent Mobile to Customer (and all copies thereof), whether in machine or human-readable form and regardless of medium, including notes, discs, electronic mails, tapes, films, reference materials and memoranda that contain, refer to, or relate in any way to the System or Convergent Mobile Content, except for necessary archival copies, provided, that Customer's confidentiality obligations hereunder with respect to the retained archival copies shall survive the termination of this Agreement and shall continue for so long as Customer retains such archival copies. If requested by Convergent Mobile, Customer agrees to certify to Convergent Mobile that all such materials (and any copies thereof) have been returned to Convergent Mobile or destroyed.
>
> (e)   Effect   of   Termination   —   Convergent   Mobile.
> Within thirty (30) days of the expiration or the receipt of notice of termination of this Agreement, Convergent Mobile will promptly

---

[1] There are two subsections labeled Section 8(e) and no Section 8(d). The first 8(e), entitled "Effect of Termination – Customer" should have been Section 8(d) and should be referred to as such to avoid confusion.

United States District Court
Northern District of California

return to Customer all Customer Confidential Information in a standard, and commercially reasonable, format designated by Customer, and return or destroy all documents and all other materials provided by Customer to Convergent Mobile (and all copies thereof), whether in machine or human-readable form and regardless of medium, including notes, discs, electronic mails, tapes, films, reference materials and memoranda that contain, refer to, or relate in any way to the Customer Confidential Information. If requested by Customer, Convergent Mobile agrees to certify to Customer that all such materials (and any copies thereof) have been returned to Customer or destroyed.

Section 11 of the MLA is a Limitation of Liabilities provision, and provides that neither party shall "**be liable to the other party for any special, indirect, exemplary, incidental, punitive or consequential damages relating in any manner to this Agreement, and whether such damages are based on contract, tort (including negligence), strict liability or otherwise, or arise from performance issues, lack of availability, reliability or delays or omissions related to System[ ] even if such persons have been advised of the possibility of such damages**" (emphasis in original).

## II.   LEGAL FRAMEWORK

Plaintiff brings three claims: breach of contract, promissory estoppel, and breach of the implied covenant of good faith and fair dealing.[2] (Dkt. No. 1.) California law controls each claim.

**Breach of Contract**:  "To prevail on a cause of action for breach of contract, the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014).  "When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract."  *Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (2011) (collecting cases).  "Normally the question of whether a breach of an obligation is a material breach, so as to excuse performance by the other party, is a question of fact."  *Id.* at 277-

---

[2]  JTH counterclaims for (i) breach of contract prior to termination, (ii) breach of contract after termination, (iii) breach of the implied warranty of good faith and fair dealing, and (iv) declaratory relief.  (Dkt. No. 48.)  JTH offered no evidence of damages either before or during trial, and thus, for this reason, all of its affirmative claims fail.  The claim for declaratory relief is addressed in the context of plaintiff's affirmative claims.

United States District Court
Northern District of California

278 (collecting cases).  "Whether a partial breach of a contract is material depends on 'the importance or seriousness thereof and the probability of the injured party getting substantial performance.'"  *Id.* at 278 (quoting 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 852, pp. 938–940).  "A material breach of one aspect of a contract generally constitutes a material breach of the whole contract."  *Id.* (citation omitted).

**Implied Covenant of Good Faith and Fair Dealing**:  Next, "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."  *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 658 (1958).  "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."  *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 371 (1992) (internal quotation marks omitted).  "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.  Such power must be exercised in good faith."  *Id.* at 372.  While it cannot impose substantive duties or limits, the "covenant of good faith and fair dealing . . . exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made."  *Guz v. Bechtel Nat., Inc.*, 24 Cal. 4th 317, 349-350 (2000).

**Promissory Estoppel**:  Finally, California has adopted the Restatement's view on promissory estoppel claims.  *US Ecology, Inc. v. State of California*, 129 Cal. App. 4th 887, 901 (2005) (citing *Kajima/Ray Wilson v. Los Angeles Cnty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 310 (2000)).  "The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3)[the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.'"  *Id.* (quoting *Laks v. Coast Fed. Savs. & Loan Ass'n.*, 60 Cal. App. 3d 885, 890 (1976)).

III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court accepts the parties' stipulated facts and makes the following findings based on

United States District Court
Northern District of California

the testimony and evidence presented at trial.[3]  The existence of the MLA and JTH's failure to pay after May 2019 are not in dispute.  The main question to be resolved is performance and whether a proper termination under the MLA occurred, and, if necessary, damages.  Thus:

### A.    Pre-Litigation Notices and Correspondence

The parties specifically negotiated a three-year contract which could only be terminated for cause as defined therein.  Relevant here, a party could only terminate "upon thirty (30) days prior written notice in the event of a material breach of the Agreement by the other party where the other party has failed to cure such breach within thirty (30) days of such notice."  Section 8(c).  JTH provided only two notices which could have complied with Section 8(c), one from May 1, 2018 and one from June 19, 2019.  The Court addresses each:

**May 1, 2018:**  On May 1, 2018, JTH sent Convergent a notice via email outlining what it believed to be material breaches of the MLA.  (Ex. 200.)  The email notice was sent by "Steve Peters – VP of Technology," "Martha O'Gorman – Chief Marketing Officer," and "David Schaefer – AVP Digital Marketing."  Only David Schaefer testified. On May 31, 2018, within the thirty-day cure period, Convergent responded and either cured or advised why the item listed was not required under the MLA.  (Ex. 237.)  JTH did nothing to object to or dispute Convergent's response.  The Court finds JTH's silence in response and continued payment under the MLA for an additional year constituted an acceptance of the proffered cure.  Thus, this letter cannot serve as a basis for JTH's termination of the MLA for cause.

**June 19, 2019:**  On June 19, 2019, JTH sent Convergent a second notice of material breaches of the MLA.  (Ex. 13.)  This letter was signed by "William B. Harvey, Senior Corporate Counsel."  This notice largely regurgitated the issues listed in the May 1, 2018 letter and thus, the response dated June 25, 2019 did as well.  As the Court finds the May 1 letter did not form the basis for a termination for cause under Section 8 of the MLA, neither does this one.  The Court provides further amplification below.

---

[3]  The twenty-nine (29) admitted exhibits, include: Exhibits 4, 9, 10, 11, 13, 14, 15, 17, 24, 25, 27, 28, 200, 204, 217, 218, 219, 222, 228, 235, 237, 239, 244, 248, and 249-53.

United States District Court
Northern District of California

Convergent responded to these letters denying any claim or allegation that it was not complying with the MLA, or in the case of the first notice providing a cure.  With regard to the second notice sent in June 2019, Convergent responded claim-by-claim on June 25, 2019, as discussed below, disputing nearly all of JTH's allegations.  (Ex. 14.)

When no further response was forthcoming, Convergent sent a demand for payment on July 10, 2019.  (Ex. 15.)  This letter noted that JTH had failed to pay the invoices issued in June and July 2019.

Finally, when Convergent received no response from JTH, Convergent's newly hired outside counsel sent one final pre-litigation letter on August 19, 2019, indicating that services would be shut down on August 21, 2019.  (Ex. 17.)  Further, it indicated that services would be terminated, in part, due to JTH's failure to make payment on three invoices (*see* Exs. 9, 10, 11), and, in part, due to an attempt to mitigate further damage to Convergent.

With this termination summary in mind, the Court now returns to the beginning.

## B.    The Parties' Contractual Relationship

The principal individuals involved in the MLA included the following: Amanda Shell, assisted by Amy Saak and Danielle Collier (before 2017), were primarily responsible for the day-to-day operations for Convergent with respect to JTH; Krishna Pillai was responsible for all programming and customization of the products delivered under the MLA; and Michael Breen was the primary contact for the client relationship with Martha O'Gorman of JTH who was the Vice-President of Marketing.  Mses. Saak, Collier and O'Gorman did not testify at trial.

The evidence was undisputed, and in fact, corroborated by JTH's own Assistant Vice President of Digital Marketing, David Schaefer, that Ms. O'Gorman and Convergent had a positive, long-term relationship.  Mr. Breen testified that Convergent catered to Ms. O'Gorman providing many services which were not listed in the MLA and Convergent considered itself Ms. O'Gorman's partner such that it served as an extension of her department, including writing speeches and assisting with presentations.  Communications between the parties were constant and extended beyond normal working hours during the high seasons.  Further, Ms. Shell credibly testified that the data Convergent was receiving from JTH for purposes of moving into a more

8

comprehensive online process was significantly corrupted and took huge amounts of time to validate and clean.  Not surprisingly, cleaning data usually takes significantly longer than anticipated.  However, having good data as one moves into the digital arena from "flag wavers" on the corners of streets, is an important starting point.

That said, there is no evidence that either Mr. Pillai or Mr. Breen had significant experience in digital marketing.  In 2014, when Mr. Schaefer joined JTH, given his significant experience, he credibly testified that Convergent did not meet his personal expectations, especially in light of the fact that Convergent was a significant expenditure for the marketing department for JTH.  Convergent perceived Mr. Schaefer's lack of support.  The problem for JTH is that Mr. Schaefer's personal expectations did not control the MLA, nor were those expectations formally communicated to Convergent.

Rather, and despite Mr. Schaefer's professional prodding, Ms. O'Gorman maintained a protective approach to Convergent, and, as VP of Marketing, communicated JTH's satisfaction with Convergent's performance notwithstanding its lack of subject matter expertise in digital marketing.  That she may have communicated frustration with respect to the lack of a report once in the spring of 2018 does not change the Court's overall assessment of her satisfaction with Convergent's performance.  To the contrary, despite the concerns raised by Mr. Schaefer, including those in the letter sent on May 1, 2018, Ms. O'Gorman did not terminate the MLA for lack of performance after Convergence's response on May 31, 2018.  Given the constant day-to-day communications between the parties, without more, evidence of one incident does not persuade the Court that Ms. O'Gorman was not satisfied with Convergent.  Moreover, JTH decision not to call Ms. O'Gorman as a witness to articulate this litigation-view further bolsters this conclusion.[4]

At a minimum, principles of good faith and fair dealing required that JTH not act in a manner which would frustrate Convergent's right to receive the benefit of the bargain under the

---

[4] Mr. Schaefer's testimony regarding Ms. O'Gorman's statements during that timeframe are hearsay and are not admissible for their truth.

MLA.  It was undisputed that Convergent provided services at a discount during the first year of the MLA which it intended to recover in years two and three.  Thus, having fired Ms. O'Gorman in the fall of 2018, and without Mr. Schaeffer who left JTH a month later due to the "toxic" environment internally and the public "turmoil" externally, it is not surprising that, with respect to this MLA, both Convergent and JTH kept proceeding on the same course as before in year two.

With twenty-twenty hindsight, it is easy to complain about the level of service such as that to which Mr. Jim Forguson testified with respect to the issues communicated via the Issue Tracker or email.  Again, Convergent believed it was responsive, communicating promptly, and resolving issues in good faith.  Mr. Forguson himself agreed that Ms. Shell was honest in her communications, including those where she reported that some of the delays were related to Google rather than Convergent.  The evidence in the record does not resolve any particular issue in this regard.  Nor does the evidence indicate that JTH advised Convergent that its approach constituted a material breach under the MLA.  Rather, in retrospect, with a new vendor, Mr. Forguson can now compare the expertise.  This retrospective view is not controlling.  Moreover, Mr. Forguson had no personal knowledge of the terms of the MLA or the requirements thereunder.

Instead, and again, with Cory Hughes as a new head of marketing, JTH's in-house counsel, William Harvey attempted to create a notice of material breach by literally cutting and pasting significant portions of the letter from May 1, 2018 into another notice letter sent over a year later on June 19, 2019.  The second notice did nothing to acknowledge the prior communications and JTH's acquiesce with respect to those issues during Ms. O'Gorman's tenure.   Mr. Harvey who sat through the entire trial chose not to testify, confirming that he had nothing to add in terms of personal knowledge.

Even reviewing the parties' different perspectives regarding the nature of the myriad breaches, the language of the MLA is vague, and the evidence presented at trial did not confirm that Convergent breached the MLA.  Both notices of termination focused on alleged breaches from "Section 2 iii"[5] and the Annex of the MLA.  Section 2(f) of the MLA reads as follows:

---

[5] The relevant section is actually 2(f) iii of the MLA.

United States District Court
Northern District of California

United States District Court
Northern District of California

<u>Operation of the System</u>. In addition to the custom development described on Annex A the Customer and Convergent Mobile warrant that each is obligated to, and will, provide the following:

i. US 411 Text Messaging Service:

***

ii. US 411 Contest Management Service:

***

iii. Business Listing Management Service (LBL Pro)

A. Customer will

1. Provide to the System a list of Customer locations and update this list on a daily basis.

B. The System will:

1. Provide ongoing management of Customer's listing and business data, including claiming, updating, and verifying Customer's business listing information and content (LDL) which will enable consistent distribution of such data to data providers, search engines and directors.

2. Distribute LDL to all main aggregators

3. On a daily basis, publish claim and manage content on all Liberty and Siempre related Google pages. For purposes of LBL, Content is defined as business name, address, phone number, website URL, business hours, profile picture, logo and cover photo.

4. Create a claiming guide to assist with promote LBL.

5. Provide an export function to provide ready access to LBL formatted for direct submissions to Yelp and other mutually agreed sites.

6. Enable and manage change tracking.

7. Provide accuracy reporting, status reporting (distribution, changes, current inventrory) as provided in Annex A.

Unless specified in Annex A, the MLA provides no further details on the requirements for the LBL Pro.

In the June 2019 notice, JTH outlined the following alleged ten breaches:

1. "Section 2, iii, B, 4: 'Create a claiming guide to assist with and promote LBL.' This is an unfulfilled deliverable per the MLA."[6] (Ex. 13.)

---

[6] The parties define "LBL" in the MLA to mean business listing information and content. Section 2(f), iii, B, 1.

11

○ This was identical to an item raised in the May 2018 email.  (Ex. 200 ("**Section 2, iii, B, 4: '**Create a claiming guide to assist with and promote LBL' **This is an unfulfilled deliverable.**" (emphasis in original)).)

○ Convergent responded that it was delivered to JTH in May 2018, and that this guide was specifically created for JTH and delivered to Jennifer Shutt. As seen above, Convergent correctly notes that the MLA does not state any specific attributes of the guide. The Court received no evidence from Ms. Shutt that she did not receive the guide nor was any evidence of a contemporaneous email from JTH disputing the same in June of 2018. Even crediting Mr. Schaefer's claim that he did not see the guide, he did not so advise in 2018 and had left the company by 2019.  Further, his vision of what would have constituted a "guide" was likely not the same as Convergent.

2. "Section 2, iii, B, 5: 'Provide an export function to provide ready access to LBL formatted for direct submission to Yelp and other mutually agreed sites.' This is an unfulfilled deliverable per the MLA." (Ex. 13.)

○ This was identical to an item raised in the May 2018 email.  (Ex. 200 ("**Section 2, iii, B, 5:** 'Provide an export function to provide ready access to LBL formatted for direct submission to Yelp and other mutually agreed sites.' **This is an unfulfilled deliverable.**" (emphasis in original)).)

○ Convergent responded that this was provided to JTH in June 2018 and that Jennifer Schutt was copied in March 2018 on the email regarding the list of mutually agreed sites.  Convergent also noted that the export functionality was inexplicably turned off for Mr. Forguson, but that they had since remedied this error.  The Court received no evidence from Ms. Shutt that she did not receive the guide nor was any evidence of a contemporaneous email from JTH disputing the same in June of 2018.  Nor did the evidence make clear whether the functionality had been on for Mr. Forguson, then

later turned off.  Notably, Mr. Forguson himself was not asked about whether he could previously access the export function, or whether he could access the export function following June 2019.

3.  'Section 2, iii, B, 6: 'Enable and manage change tracking' This is an unfulfilled deliverable per the MLA." (Ex. 13.)

  o  This was substantively identical to an item raised in the May 2018 email. (Ex. 200 ("**Section 2, iii, B, 6:** 'Enable and manage change tracking.' **Evidence of this would need to be provided to allow us to see the changes Convergent Mobile have made in a consumable and documented format. This reporting would need to be contemporaneous and accessible to JTH Tax Inc immediately upon request.**" (emphasis in original)).)

  o  Convergent responded that this feature along with daily reports had since May 2018 been provided to Mr. Forguson and Ms. Jennifer Schutt.  The Court received no evidence from Ms. Shutt that she did not receive the change tracking.  Mr. Forguson testified that he tracked changes on a daily basis with Ms. Shell.  As noted above, the MLA does not specify any particular method.  Additionally, there was no evidence of a contemporaneous email from JTH disputing the same in June of 2018.

4.  Annex A to MLA: Phase 1, Part 1: LBI- Pro access through Zeenet: "**A: 'APIs for Bing, Google, and Apple:** 1. Locations are processed upon receipt and after successful validation will be distributed to Google, Bing, and Apple using APIs within six (6) hours of validation. 2. Location information from the Liberty Admin System is received automatically via API at the System. 3. The System will notify Liberty about locations that do not pass validation. Liberty will review and correct any invalid information.' These APIs do not exist, and the services are not delivered within 6 hours of validation." (Ex. 13 (emphasis in original).)

  o  This was substantively identical to an item raised in the May 2018 email.

(Ex. 200 ("**A:** 'APIs for Bing, Google, and Apple: 1. Locations are processed upon receipt and after successful validation will be distributed to Google, Bing, and Apple using APIs within six (6) hours of validation. 2. Location information from the Liberty Admin System is received automatically via API at the System. 3. The System will notify Liberty about locations that do not pass validation. Liberty will review and correct any invalid information." – **We require evidence that these APIs, systems, and services are in place and working properly according to the language of the contract.**" (emphasis in original)).)

o   With respect to LBL Pro access through Zeenet, Convergent responded that this work was completed in May 2018, and that it had awaited a response from JTH for over a year.  Mr. Pillai testified that this work had been completed and access given to five individuals from JTH (Ms. Schutt, Mr. Schaeffer, Ms. O'Gorman, Mr. Forguson and Mr. Peters), but Mr. Schaeffer testified that this access was not working properly or functioning.  Notably, Mr. Schaeffer could not recall whether he or anyone ever conveyed these issues to Convergent beyond the May 2018 email.  Additionally, there was no evidence of a contemporaneous email from JTH disputing the same in June of 2018.

o   With respect to the APIs for Bing, Google, and Apple, JTH claimed that these services were not in place, and that they took longer than six hours in violation of the MLA.  Convergent responded that the system had been in place since December 2017, and that JTH was receiving any invalid information through daily emails.  Mr. Pillai had testified, corroborated by Ms. Shell, that this data could be observed from the user interface of the dashboard.  Moreover, in accordance with Convergent's May 31, 2018 response, Convergent began sending emails containing "Change Tracking" and "Failed Store" files to Ms. Schutt.  The Court received no evidence

14

1        from Ms. Shutt that she did not receive these emails or files, nor was there

2        any evidence of a contemporaneous email from JTH disputing the same in

3        June of 2018.

5. Annex A to the MLA, Phase 1, Part 3: "[']**B: Google My Business (GMB) Insights:** 1. Current reporting available in LBL Pro includes GMB Insights data on a Brand and Location level. 2. New Insights data is released daily. (There is currently a delay of 3-4 days in Google's release of data. The LBL Pro system accommodates for this delay. As Google makes improvements on their timing the System will be updated to accommodate improve Google timing.) Metrics currently included in this reporting are: Count of Direct and Discovery Searches; Count of Map and Search Views; Count of Website, Direction and Call Actions. All Metrics are available on a daily basis, summation occurs based on date range selected by JTH Tax, Inc. when running the reports. 3. Additional modifications already in progress for GMB reporting are: Monthly trend charts showing totals of all locations for Searches, Views and Actions (including count of direct and discovery searches such as brand and keyword searches, count of map and search views and count of website, direction and call actions.) 4. Export functionality of data for the GMB report: Brand level is available in both Excel and PDF formats. Locations level is available in PDF format.'  These metrics are not available or sent to us on a daily basis as we have no access to the LBL Pro system and have no reports sent to us daily. The additional modifications mentioned are not sent to us monthly as indicated. We have received 1-2 of these 'monthly trend' reports and not at regular intervals – these had to be requested and the follow through was extremely slow. Export Functionality is not available in Excel."  (Ex. 13. (emphasis in original))

     o   This was substantively identical to an item raised in the May 2018 email.[7]

---

[7] (Ex. 200 ("[']**B: Google My Business (GMB) Insights:** 1. Current reporting available in LBL Pro includes GMB Insights data on a Brand and Location level. 2. New Insights data is released daily. (There is currently a delay of 3-4 days in Google's release of data. The LBL Pro

15

    ○ JTH claimed that certain GMB metrics were not provided per the MLA. Convergent responded that these metrics are available through the GMB dashboard and have been available since the inception. For instance, Ms. Shell credibly testified that these metrics were available to JTH, through a separate user account maintained by JTH, and that she was aware of at least one JTH employee named Occasio Gee who had access to the dashboard. Further, Ms. Shell testified that to the best of her knowledge she had sent the requested reports.  Additionally, there was no evidence of a contemporaneous email from JTH disputing the same in June of 2018.

6. Annex A to the MLA, Phase 2, Part 1.: "LBL Pro is supposed to permit certain custom content to be maintained for use in GMB," including AdWords Extension, Phone Communications Manager, and Email.  (Ex. 13.)

    ○ This was a new notice item that had no analogue to any items reported in the May 2018 email.  (*See generally* Ex. 200.)

    ○  JTH claimed that this functionality was not available.  Convergent conceded that this functionality had not been available when it responded in June 2019, but responded that this was a new notice item that would be

---

system accommodates for this delay. As Google makes improvements on their timing the System will be updated to accommodated improve Google timing.) Metrics currently included in this reporting are: Count of Direct and Discovery Searches,; Count of Map and Search Views; Count of Website, Direction and Call Actions. All Metrics are available on a daily basis, summation occurs based on date range selected by JTH Tax, Inc. when running the reports. 3. Additional modifications already in progress for GMB reporting are: Monthly trend charts showing totals of all locations for Searches, Views and Actions (including count of direct and discovery searches such as brand and keyword searches, count of map and search views and count of website, direction and call actions.) 4. Export functionality of data for the GMB report: Brand level is available in both Excel and PDF formats. Locations level is available in PDF format.' **These metrics are not available as we have no access to the LBL Pro system and have no reports sent to us daily. The additional modifications mentioned are not sent to us monthly as indicated. We have received 1-2 of these "monthly trend" reports and not at regular intervals – these had to be requested and the follow through was extremely slow. Export Functionality is not available, and if it is, we haven't been shown/trained on how to do this. This is an unfulfilled deliverable.**" (emphasis in original)).)

1    rectified under the 30-day cure period.  Ms. Shell generally testified that

2    such custom fields (*e.g.* AdWords Extension, Phone Communications

3    Manager) were included in the LBL Pro used by Convergent for JTH, but

4    did not specify a time frame for when these were implemented.  Otherwise,

5    no further information was provided on this topic during the trial by the

6    parties.

7    7.  Annex A to the MLA, Phase 1, Part 3, A: Dashboard Analytics: "the dashboard is

8        supposed to provide an overview of the count of brand locations, distribution

9        activity and user accounts. The Dashboard does not provide access to user

10       accounts."  (Ex. 13.)

11       o   This was substantively identical to an item raised in the May 2018 email.

12           (Ex. 200 ("['] **A: Dashboard Analytics**: 1. Current dashboard provides

13           overview of the count of brand locations, distribution activity and user

14           accounts. 2 Dashboard improvement (See Part 3, Sections A and B)[.]' **We**

15           **have never received access to a dashboard for analytics nor has this**

16           **been offered to our POC with Convergent Mobile for Local Business**

17           **Listings, Jennifer Schutt - Web Content Specialist.**" (emphasis in

18           original)).)

19       o   JTH claimed that the user accounts were not providing certain contracted

20           information to be properly displayed.  Convergent responded by noting that

21           individuals at JTH were provided with access to the system, and that these

22           individuals could have requested the information on demand.  Convergent

23           also noted that increased functionality was coming by week's end of their

24           June 2019 response letter.  Mr. Schaeffer testified that Convergent

25           responded in May 2018 by sending credentials to him and several other JTH

26           employees.  Despite these new credentials, he was unable to log in to the

27           system with the credentials provided, nor could he access the system with

28           the credentials provided for the other JTH employees.  Significantly,

17

United States District Court
Northern District of California

however, Mr. Schaeffer testified that he could not recall that he communicated his inability to log into the system directly to Convergent. Mr. Schaeffer did inform his boss, Ms. O'Gorman, but was unaware whether she communicated this concern to Convergent. The Court emphasizes that JTH did not call Ms. O'Gorman as a witness, and there was no evidence of a contemporaneous email from JTH disputing the same in June of 2018. Indeed, Ms. Shell testified to her knowledge that neither she nor Convergent ever received notice that there was ever an issue with the credentials provided to log into the system.

8.   Annex A to the MLA, Phase 2, Part 2: "Social Media guidelines, Address Best Practices, Yelp Claiming, etc. will all be easily available from the LBL Pro dashboard so Zees can reference at any time. This deliverable is not available" And "PlotMe" functionality in the LBL Pro System: "You represented that this will permit real-time collection of lat/long coordinates of locations as well as storefront photos. Lat/Long information will assist in any PIN marker corrections needed. Photos should be sent to corporate for approval prior to distribution to Google. Photos can also be used on Office Pages with libertytax.com as needed. There is no PlotMe functionality in the LBL Pro System. Thus, this deliverable has not been met." (Ex. 13.)

   o   This was a new notice item that had no analogue to any items reported in the May 2018 email. (*See generally* Ex. 200.)

   o   JTH claimed that these were unfulfilled deliverables under the MLA. Convergent correctly pointed out that this specific request's deadline was on or before the end of the second year of the contract, was November 30, 2019. Both Ms. Shell and Mr. Pillai testified that it was their and Convergent's understanding that the second year of the contract included any date before November 30, 2019. There was no other evidence introduced into the record of a different interpretation. Accordingly, that

United States District Court
Northern District of California

interpretation controls as it is reasonable.

9.  JTH further cited to an incident that occurred in February 2019, whereby there was a reporting issue in the system where text messages were sent did not correctly populate on the reporting page: "There was a reporting issue where text messages that were sent, did not populate on the reporting page. This caused a loss of faith in the system used by Convergent and skepticism about the reports generated in general." (Ex. 13.)

o  As this occurred in February 2019, there was no analogue to any items reported in the May 2018 email. (*See generally* Ex. 200.)

o  Convergent responded that this one-time occurrence was remedied the next day in February 2019. Indeed, Mr. Forguson confirmed that this was a one-time error, but that JTH otherwise had problems with the text messaging platform. Despite these issues, Mr. Forguson also stated that Mr. Breen at Convergent was his "go-to guy for texting" and that such problems were likely resolved by Mr. Breen. There is otherwise no evidence that Convergent was unresponsive or failed to address an issue with JTH regarding the text messaging platform.

10. JTH also cited to the complete inability to send ad-hoc texts: "Next, there is a complete inability to send ad-hoc text. There were multiple times throughout the tax year that Liberty wanted to take advantage of certain initiatives as they came up, but could not, as we had to wait 24-48 hours to text, instead of being able to text in real time." (Ex. 13.)

o  This was a new notice item that had no analogue to any items reported in the May 2018 email. (*See generally* Ex. 200.)

o  Convergent responded that the MLA does not require this service to be provided to JTH from Convergent. Mr. Hughes testified that it was his understanding that ad hoc texting would be industry standard in similar contracts, though the Court discounts his testimony where Mr. Hughes has

19

United States District Court
Northern District of California

1  |  not had experience drafting agreements similar to the MLA.  Notably, no
2  |  witness called by JTH could identify any relevant MLA section that
3  |  required ad hoc texting.  Indeed, Mr. Pillai had built custom "pieces of
4  |  software" to enable some ad hoc texting due to requests from Mr. Forguson,
5  |  but that this was outside of any requirements imposed on Convergent
6  |  through the MLA.

7      JTH further submitted evidence in the form of emails and reflecting other issues it had with

8  Convergent and its services.  However, each email thread reflects that Convergent resolved these

9  issues, and JTH did not otherwise follow up or demonstrate any dissatisfaction with the ultimate

10  remedy or resolution of these issues.

11      Accordingly, in light of the foregoing, the Court finds that JTH breached the MLA for

12  failure to pay without complying with the termination clause under the MLA, and alternatively, by

13  breaching the covenant of good faith and fair dealing to the extent that it failed to communicate

14  any perceived breach to Convergent after it had communicated its response to the May 2018

15  letter.[8]  The Court need not make findings on the claim of promissory estoppel as it was pled in

16  the alternative.

17

18

19

20      [8]  The Court is further unpersuaded by JTH's eleventh-hour attempt to characterize
21  Convergent's use of subcontractors as a material breach of the MLA.  JTH points to Section 1b. of
    the MLA, which provides:

22          Access to the System as described herein and on Annex A and
23          individual Platform Services described in Annex A require (i) custom
        development or graphic services or (ii) integration of certain
24          applications owned by Customer, or licensed to or otherwise made
        available to Customer by third parties (collectively, "Customer
25          Applications") through an API connection to the System..

26  Neither this statement nor the section it is contained within unambiguously prohibit Convergent
    from relying on third-parties in providing services to JTH under the MLA.  Furthermore, the
27  notion that it raised security issues is belied by a specific section related to Security which does
    not import such concerns.  *See* "**Section 6. Authorized Persons; Security.**"  The Court therefore
28  summarily rejects this argument.

C.    **Damages**

1.    **Convergent's Affirmative Claims**

Having found JTH violated the terms of the MLA, contract damages are due thereunder. *See Copenbarger v. Morris Cerullo World Evangelism, Inc.*, 29 Cal. App. 5th 1, 9 (2018) ("Contract damages seek to approximate the agreed-upon performance. '[I]n the law of contracts the theory is that the party injured by breach should receive as nearly as possible the equivalent of the benefits of performance.'" (quoting *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515 (1994))); *Postal Instant Press v. Sealy*, 43 Cal. App. 4th 1704, 1709 (1996) ("Under contract principles, the nonbreaching party is entitled to recover only those damages, including lost future profits, which are 'proximately caused' by the specific breach. . . . Or, to put it another way, the breaching party is only liable to place the nonbreaching party in the same position as if the specific breach had not occurred. Or, to phrase it still a third way, the breaching party is only responsible to give the nonbreaching party the benefit of the bargain to the extent the specific breach deprived that party of its bargain.").

California law also employs "[t]he doctrine of mitigation of damages [which] holds that [a] plaintiff who suffers damage as a result of . . . a breach of contract . . . has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided." *Agam v. Gavra*, 236 Cal. App. 4th 91, 111 (2015) (internal quotation marks omitted). "Under the doctrine, [a] plaintiff may not recover for damages avoidable through ordinary care and reasonable exertion." *Id.* "However, [t]he duty to mitigate damages does not require an injured party to do what is unreasonable or impracticable." *Id.* Moreover, "[w]here the fact of damages is certain . . . the amount of damages need not be calculated with absolute certainty. The law requires only that some reasonable basis of computation be used, and the result reached can be a reasonable approximation." *Acree v. Gen. Motors Acceptance Corp.*, 92 Cal. App. 4th 385, 398 (2001). "Whether a plaintiff acted reasonably to mitigate damages . . . is a factual matter to be determined by the trier of fact." *Powerhouse Motorsports Grp., Inc. v. Yamaha Motor Corp. U.S.A.*, 221 Cal. App. 4th 867, 884 (2013). "The burden of proving a plaintiff failed to mitigate damages is on the defendant." *Id.*

United States District Court
Northern District of California

Here, the monthly invoice due under the MLA was $125,400. (Exs. 9-11.)  For the months of June through August, 2019, the amounts totaled $376,200.[9]  In September 2019, Convergence laid off its employees and apparently did nothing to replace the contract work lost other than to focus on suing JTH.  Mr. Breen testified that during the term of the MLA, after expenses, Convergent would net $30,000 to $40,000.  However, neither party introduced any documentary evidence to substantiate this claim.  The Court believes that Mr. Breen inflated the amount given his interest in the outcome of this case. Given its duty to mitigate, the Court finds that Convergence is due no more than $15,000 per month for the balance of the MLA after August 2019, for an additional amount of $225,000.  Accordingly, with the three months totaling $376,200 and the fifteen months totaling $225,000, the Court awards damages of $601,200.[10]

The Court further finds that Convergent is owed prejudgment interest.  In general, California Civil Code section 3287(a) provides that "[a] person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day." "Prejudgment interest is allowed where the amount due is fixed by the terms of a contract" and Convergent is entitled to recover prejudgment interest on the sum awarded from the time such sum became due.  *Leaf v. Phil Rauch, Inc.,* 47 Cal. App. 3d 371, 376 (1975). The Court has no discretion under Civil Code section 3287(a) and must award prejudgment interest upon request from the first day there exists a breach and a liquidated claim.  *North Oakland Med. Clinic v. Rogers*, 65 Cal. App. 4th 824, 828 (1998).  Where there is no legal rate provided by a contract, the legal rate of interest is 10 percent per year. Cal. Civ. Code § 3289(b).

Here, the MLA provides for one percent per month for delinquent payments on each invoice.  (Ex. 4 ("SECTION VII – INVOICING . . . C. Invoices due, net 30. Convergent Mobile

---

[9]  Extended the full term of the balance of the contract (18 months remaining) would have totaled $2,257,200.

[10]  The Court notes that Convergent withdrew consequential and incidental damages before trial that were the subject of a motion for partial summary judgment filed by JTH.  Convergent's damages therefore are limited to a request for the payments due under the MLA.

United States District Court
Northern District of California

may charge interest at the rate of one percent (1%) per month for delinquent payments for each 30-day periods delinquent.").)  JTH failed to pay Convergent for three invoices before Convergent mitigated its damages and shut off services at the end of August.  Thus, the Court finds that the one percent rate if applicable for the three invoices issued for June, July, and August 2019, and applies the 10 percent per year rate to the remaining amounts due from September 2019 to November 2020.

With respect to JTH's argument that Convergent terminated the MLA itself and that it therefore is not entitled to damages strains credulity.  First, JTH was the party that first materially breached the MLA by failing to make payments on the invoices.[11]  Specifically, JTH failed to make payment for the invoices issued in June, July, and August 2019.  Even under an interpretation that JTH's June 2018 letter constituted a formal notice as required under the MLA, JTH still failed to timely make payment due under the MLA to Convergent.  Thus, the facts do not support that Convergent terminated the MLA where JTH was the first party to alter the contractual relationship.

Second, JTH failed in both pre-litigation and during this litigation to point to a specific provision in the MLA that Convergent materially breached.  This is especially so where the MLA required JTH to give Convergent thirty (30) days to cure any perceived or actual breach of the MLA.  Instead, JTH recycled and regurgitated a substantively similar letter from 2018 for its June 2019 letter, alleging various violations of the MLA that Convergent noted, with the sole exception of one item, were resolved some time ago.  JTH's failure to further engage in a good faith dialogue over these issues demonstrates not only a breach of the MLA by JTH, but a further breach of the implied covenant of good faith and fair dealing contained therein.

### 2.    Issue of Attorneys' Fees

The Court next addresses the issue of attorneys' fees, which was the subject of motion for

---

[11]  The Court is unpersuaded by JTH's arguments that Convergent's officers testified in their deposition that it was Convergent which terminated the MLA.  These "gotcha" moments do not persuade where they are based on a hyper-technical arguments that do not reflect the substance of the witnesses' responses made in the deposition.

1   partial summary judgment filed by JTH.  (Dkt. No. 65.)  Based on the MLA and the record before

2   the Court, the Court concludes that attorneys' fees are *not* available to the parties.  Convergent

3   points to Section 10 of the MLA as authorizing the payment of attorneys' fees.  Convergent also

4   introduced evidence that, during the negotiations of the MLA, JTH's counsel drafted and inserted

5   the specific language of Section 10 into the MLA.  (*See* Exs. 25, 27, 28.)  Section 10 in its entirety

6   provides:

> **10. Indemnification**
> (a) Convergent Mobile's Obligations.
> (i) Convergent Mobile shall indemnify, defend and hold harmless Customer and its Representatives, from and against any losses, liabilities, judgments, settlements, damages and costs, including attorneys' fees and disbursements (collectively, "Losses"), resulting from or arising out of any third-party suits, actions, claims, demands or similar proceedings (collectively, "Proceedings"), to the extent that they are based upon or in connection with a claim that the System or Platform Services, or any portion thereof, infringes or violates a third party's IP Rights. Convergent Mobile's shall not be liable for any such indemnification to the extent such infringement is attributable to any information sent by the Customer to Convergent Mobile or to Customer's use of the System or Platform Services.
>
> (ii) In the event that a third-party claims that the use of all or portion of the System or Platform Services infringes such third party's IP Rights, or, in Convergent Mobile's judgment, the use of all or portion of the System or Platform Services may be enjoined for any reason, Convergent Mobile may, at its sole election, (A) defend against such claim, (B) modify or redesign the System to avoid such infringement claim, (C) obtain a license from such third party to permit Customer's continued use of the System, or (D) terminate the Agreement with respect to such portion of the System. Subject to Section 11(a) (i) of this Agreement, the provisions of this Section 11 (a) (ii) state the sole and exclusive liability of Convergent Mobile, and the exclusive remedy of Customer, with respect to any such third-party claim.
>
> (iii) Convergent Mobile shall indemnify and hold harmless Customer and its Representatives, from and against any and all losses, costs and expenses (including reasonable attorney's fees and costs) that may be incurred because of Convergent Mobile's violation of any representation or warranty or any material breach of this Agreement by Convergent Mobile, including without limitation, the representations and warranties contained in Annex A.
>
> b) Customer's Obligations. Customer shall indemnify, defend and hold harmless Convergent Mobile and its Representatives from and against any Losses resulting from any Proceedings to the extent that they are based upon or arise out of Customer's material breach of its obligations in Section 12.

28   Section 10 by its plain language and the structure only applies to instances concerning

United States District Court
Northern District of California

1    indemnification from actions brought by third parties.  The section is not only specifically titled

2    "Indemnification," but the provision only addresses issues of indemnification.

3         California law does not authorize the award of attorneys' fees for prevailing parties in a

4    contract dispute unless authorized by that contract.  Generally, the provision would be stand-alone

5    where it is intended to be generally applicable to all disputes.  Instead, as noted above, the

6    identified fees provision is located within the indemnity provision.  Moreover, an express

7    indemnity clause "is enforced in accordance with the terms of the contracting parties' agreement."

8    *Prince v. Pac. Gas & Elec. Co.*, 45 Cal. 4th 1151, 1158 (2009).  Indeed, a "court will not infer that

9    the parties intended an indemnification provision to cover attorney fees between the parties if the

10   provision does not specifically provide for attorney's fees *in an action on the contract*." *Alki*

11   *Partners, LP v. DB Fund Servs., LLC*, 4 Cal. App. 5th 574, 600 (2016) (quotation marks omitted).

12        Here, nothing in the contract suggests such a broad reading of the indemnification

13   provision.  In fact, the parties' contract negotiations confirm this view.  Mr. Stephen Peary, who

14   negotiated the MLA on behalf of Convergent, testified this specific provision was inserted by

15   JTH's counsel, Kathleen Curry.  He tried to delete it, but she insisted in maintaining the provision.

16   The notations and comments from the redlined documents confirm that the provision concerned

17   indemnification only.  (*See* Ex. 25 at 10 (comment from Mr. Peary, stating "Kathleen: Convergent

18   Mobile indemnifies for IP and confidentiality breaches – that is it").)  This is so even when

19   construing any ambiguities in this provision of the MLA against JTH, which is the drafter of this

20   provision.  *See Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020)

21   ("[A]mbiguous contract provisions [are] construed against the drafter." (citing *Penthouse Int'l,*

22   *Ltd. v. Barnes*, 792 F.2d 943, 948 (9th Cir. 1986); *Jacobs v. Freeman*, 104 Cal. App. 3d 177, 189

23   (1980)).  Ultimately, Mr. Peary agreed to the provision on behalf of Convergent as he was aware

24   of California Civil Code section 1717 and knew it would be construed to benefit both parties. That

25   reciprocal construction though only relates to indemnification.  Convergent cannot transform this

26   limited attorneys' fees clause into one for a prevailing party generally.[12]

27   _____

28        [12]  Given that the Court has found that the MLA provides for no attorneys' fees, and that
     Convergent withdrew incidental and consequential damages, the Court **GRANTS** the motion for

United States District Court
Northern District of California

United States District Court
Northern District of California

1

### 3. JTH's Affirmative Claims

Finally, as previously noted, JTH failed to introduce any evidence as to its damages with regard to its affirmative claims.  The Court notes that there is some evidence in the record and on the docket that Convergent may have withheld certain information that should have been returned to JTH following the termination of the MLA.[13]  However, JTH failed to quantify any monetary harm as a result of Convergent's failure to return certain information to JTH.[14]  Accordingly, the Court concludes that, because of JTH's failure to introduce evidence supporting its damages, that JTH's claims fail as a matter of law.

## IV.    CONCLUSION

Accordingly, the Court finds that judgment should be entered in favor of Convergent in the amount of $601,200 plus prejudgment interest and costs.

Convergent shall file a form of judgment, approved as to form by JTH, within five (5) business days of this Order.

This Order terminates Docket Number 65.

**IT IS SO ORDERED.**

Dated: April 22, 2021

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE

---

partial summary judgment.  (Dkt. No. 65.)

[13]  The Court notes, however, that the record further reflects other substantial evidence that JTH still had and has access to its GMB account which is separate and apart from Convergent's account, notwithstanding JTH's claims to the contrary.  Moreover, the MLA contains protections for Convergent's separate intellectual property, including the GMB account owned by Convergent.  (*See* Ex. 4 (section 3).)  Thus, at the very least, it is unclear if there is anything that Convergent still retains in violation of the MLA's requirement that Convergent return JTH's data following the termination of the MLA.  The Court need not resolve this discrepancy given that JTH has failed to quantify the damages resulting from Convergent's alleged withholding of JTH's GMB account.

[14]  JTH's citation to Convergent's letter offering to return access to JTH's GMB account as to the amount of damages does not persuade.  The amount requested by Convergent totals the amount that was then due to Convergent under the MLA to the date of that letter.  The Court fails to see how such a value can be attributed to the damages suffered by JTH based on Convergent's alleged withholding of its GMB account or its data therein.